Good morning. My name is David Craft. I represent Aurora Vasquez. Mr. Craft, could you move over and speak in front of the mic? Speak loudly so we can hear you. Yes. I'm not as young as I used to be. My name is David Craft. I represent Aurora Vasquez and Hector Lozano, Jr. through her guardian, ad litem Yvonne Morales. They are the plaintiffs and appellates. This is a matter that stems from an incident where Hector Lozano, a 32-year-old pre-trial detainee suffering from a long history of severe mental illness, committed suicide while in the custody of the Santa Clara County Main Jail. The county violated Mr. Lozano's 14th Amendment rights when they failed to provide adequate medical care and failed to protect him from committing suicide. The district court erred in ruling on plaintiff's claim that Hector Lozano's medical care was inadequate because the court applied the subjective standard. This court held in Gordon v. Orange County that the test for inadequate medical care is the objective test rather than the subjective test. There are additional errors. Arguably, the district court found that there was a deprivation of Mr. Lozano's constitutional rights when the district court stated, quote, Let me ask you this. What are the factual disputes that a jury needs to resolve? I think the facts are pretty undisputable. Well, I'm asking are there any facts in dispute? I mean, does everybody agree that at the time, you know, the days before, about the status of his mental status at the time, you know, a couple of days before he committed suicide and the day of, I mean, what did the medical records show or the experts? Well, the medical records show that As I understand it, the experts did not agree with each other, correct? Well, I think that the county's expert agreed that Mr. Lozano was severely mentally ill and did not belong in solitary confinement and should have been transferred to a mental health facility. That's what he said. He also said that Mr. Lozano was suffering from hallucinations, which contributed to his suicide. So as to what factual Well, you don't You didn't move for summary judgment, did you? No. Then We responded to the county's motion. Well, okay. You can defeat summary judgment in several ways. One, the district court makes an error of law. Or there were tribal issues of fact that precluded summary judgment. Yes. Right? And we think there were both. Okay. Well, when I just asked you, what are the tribal issues of fact? The tribal issues of fact, Your Honor, are that Mr. Lozano was placed in a solitary confinement facility where the county did not have any other place to put him. He was a severely mentally ill inmate who had ideations of suicide expressed to him. And the county had no appropriate place to put him. So they put him in isolation. And then while he was in isolation, his condition deteriorated. They then take him When he said, I'm suicidal now, they put him in their 8A, their intense psychiatric facility. They put him in there for two days. He said he's no longer suicidal. So they took him out. They put him back into isolation in a cell that is basically in the dungeon of this jail. They put him behind two metal doors where he can't be seen, he can't be heard. And they don't have a welfare check that is up to standard. They put him in there with his clothes, including his bed sheets. And he previously expressed that he was acting out by putting a bed sheet around his neck, and that's how he expressed it. But who made the decision that he didn't need 15-minute checks? The decision that was made on November — I'm sorry, May 13th, 2015, was by a man named Mr. Choi. He was a clinician there. And he said he can be taken off 15-minute checks, but he needs to go to a facility — a cell where you can have close supervision. All right. How does Mr. Manstock fit into this? Mr. Manstock is the person, the medical clinician, the mental health clinician, who first encounters Hector Lozano in the isolated cell after he comes off of his suicide. And after Mr. Choi says he should not be in — he should be in an administrative cell where they can closely observe him. He wasn't there because the classification unit overrided, overruled Mr. Choi's recommendation. Was that Manstock? No. Who was it? That was a man named Mr. Navarretti. He overruled it. And the reason that he said he overruled it was because Mr. Lozano was in protective custody. And they had no place else to put him. So they had two choices. They actually had three choices. They can put him on 8A if he's acutely suicidal. And for the county, that means he has to express, I'm suicidal right now. Or they can put him in an observation cell, which they didn't do. Or they put him in isolation, which they did do. And he was in solitary confinement for 54 days. And every time he came out of solitary confinement because he said he was suicidal, they put him back in. They put him back in with his sheets and his clothing and inadequate welfare checks. And he eventually took his life exactly how he told them he was going to do it. He used his bed sheets. So your argument is that taking all of that, and under our recent case of Castro, he was a pretrial detainee, right? He's a pretrial detainee. He's waiting to go to trial. He is. Right. So it's an objective standard. Correct? Yes. And so your argument is that everything you just went through, a reasonable trial fact, a jury. Yes. Could objective, on most facts, could determine that there was, objectively, that there was a deliberate, that adds up to deliberate, yes, deliberate indifference. Yes, Your Honor. Not only I think a reasonable jury could find that. I think with these facts, it's most likely that a reasonable jury. I don't know of any other determination under these facts that you can make that a person would do that to a severely mentally ill person, put him in this dungeon with his bed sheets, when he said he's going to kill himself with his bed sheets, and don't watch him. I mean, they did everything but give him a manual. Counsel, under Castro, we talked about the liability of the county as opposed to distinct from the individuals. Yes. So for the county, there has to be a municipal policy that is a direct causal link with the constitutional deprivation. Yes. Could you please first identify for me the policy that you are relying upon to support the constitutional claim? What's the policy? The policy is that this jail did not have a policy. So it's the lack of a policy. It's the lack of a policy to put, to deal with severely mentally ill inmates. So could you tell me what case supports the proposition that the lack of a policy is sufficient under the 14th Amendment to establish municipal liability? Well, let me take another step forward. Well, could you cite me the case first that you're relying on? I don't have that case. So let me answer the question in another way, if I may. The county knew that they had inmates that would be arrested that had severely mentally ill issues. They knew that they had at least 20 suicide deaths in the Santa Clara County Jail from 2010 to 2015. They knew that these things were happening in their jail, and they did not address the issues.  They didn't address an obvious shortcomings with the way they handled their mentally ill inmates. Let me clarify one thing for my own understanding. I thought that the district court said that there cannot be municipal liability here because there's no individual defendant that's violated a constitutional right. Is that right? That's what the district court said, and I think that's an error. Okay. All right. So, but did you ever point out to the district court, well, here are some affirmative policies and, like, what, you know, following up on what Judge Rawlinson just said? We pointed out the actions of the individuals because the county can only act through individuals. Yeah, but a county can't, well, go ahead. Well, so the district court says, said that the county wholly failed to protect one of its most vulnerable inmates. So the only way that the county can do that is through individuals who act, and we think that the individuals who act. Well, you've confused things a little bit. So I thought that you had listed some policies or you had presented, you had laid out some policies like failure to train, how they ---- We did, Your Honor. Failure to train about how to recognize somebody. Right. You know, we also, the policy of having classification override mental health. Right. Which they did in this case. So isn't the question really whether or not, so the county can be held liable several ways. One, if it fails to train an officer and the failure of training is a direct result of the officer's unconstitutional conduct. Okay. That's one way. The county can also just have a policy that is the causal, provides the causal connection to the constitutional violation. Right? Yes. So the district court here said, well, you can't hold the county liable because an individual is not liable. That's, I don't think that's correct. But nonetheless, as I understood what your argument was, is you had the, there were these other policies, but the county, but the district court didn't evaluate them and ask whether or not these there was a tribal issue of fact as to whether or not any of these other policies could be the cause of the alleged constitutional deprivation suffered by Mr. Vasquez, Mr. Lozano. Not could be the cause, but there's a causal link. Causal link. Between the policy and, so we're under no vote review. So if the record reflects that, we would be able to assess that. But I didn't see in the record where there was any causal link shown between any policy from the county and the suicide. And the policy has to be adopted by a policymaker. Right? The policymaker in this case is the undersheriff who admits that putting people in solitary confinement, coming off welfare check with their sheets, is not something that they should do. And I. Okay. Counsel, we've exhausted your time. Why don't we hear from the county, and I'll give you a chance to respond. Good morning, Your Honor. My name is Melissa Kiniakoulis, and I represent the county of Santa Clara and the individually named employees. Mental health staff at the county jail repeatedly assessed Mr. Lozano for suicide risk throughout his incarceration, and during each assessment had to make a difficult prediction about whether he was suicidal. When he was deemed to be a suicide risk, he was placed on suicide watch, and his clothing and bedding were removed. And when he was stabilized, his clothing and bedding were returned. Tragically, Mr. Lozano committed suicide the same day a mental health professional assessed him and concluded that he was not suicidal. A conclusion we now know was incorrect. At most, this was an error of clinical judgment, but Mr. Lozano's suicide was not the result of deliberate indifference. Mr. Manstock did not act with deliberate indifference or reckless disregard toward Mr. Lozano's constitutional rights. When he assessed him and determined, albeit incorrectly we now know, that he was not suicidal, Mr. Lozano had reported that he was sleeping, he was eating, he was taking his medication, he was not suicidal. The housing officer in Mr. Lozano's housing unit had told Mr. Manstock. Let me ask you, what information did Manstock have available to him when he made that decision? He testified in his deposition, which is in the record, that he reviewed Mr. Lozano's file. The medical records also indicate that Mr. Manstock had previously evaluated Mr. Lozano in December of 2014. The suicide occurred the day of. But we're talking about the time period shortly before the suicide. Yes, Your Honor. So Mr. Manstock testified. He reviewed his medical file, and he went up to the housing unit and he spoke with the officer who reported that Mr. Lozano was doing well, and then he went to Mr. Lozano's and spoke with him and conducted his assessment. So that's the information he had available to him that day. Let me back up. My notes have it that around May 10th, Lozano expressed suicidal ideations. Is that right? Yes. So on May 10th, a different mental health provider responded to a request from the housing officer in Mr. Lozano's housing unit that Mr. Lozano ask to see mental health. So a marriage and family therapist saw him on May 10th. She spoke with him, she did an assessment, and she placed him on 15-minute checks. So he was put into an observation cell where he was on suicide watch, and he was checked again on May 11th by that same mental health professional. She noted that he reported that he was feeling better, that he was not suicidal. He was described as neat, relaxed, and friendly, goal-directed, and not at imminent risk for danger to himself. That was the next day. That was the next day, and she testified in her deposition, which is in the record that she kept him on suicide watch as a precaution, and she came back on May 12th, you know, the next day and assessed him again. And Mr. Lozano reported he did not feel suicidal, and he asked to have his medication increased. His appearance was neat and clean. He was relaxed and friendly, and she again maintained the suicide checks. So on May 13th, a different marriage and family therapist, who Mr. Kraft mentioned earlier by the name of Jay Choi, assessed Mr. Lozano, and he also concluded that Mr. Lozano was not suicidal. Mr. Lozano asked to have his clothing back because he was in something called a Ferguson gown, which is a suicide smock, and Mr. Choi determined that he could have his clothing and bedding returned and that he could be taken off 15-minute checks. And it's true that Mr. Choi noted that Mr. Lozano should be in a special management housing unit. He recommended that. And it's true that classification deemed Mr. Lozano was ineligible for that because he was in protective custody as a gang dropout. He had a history of assaulting other inmates. He had a history of assaulting staff. And because he was violent toward other inmates, he could not have a cellmate. He could not program with the vulnerable inmates that were in the special management housing units who themselves were. Well, so if Choi had recommended the special housing need, why wasn't there some other opportunity available? Well, at that time at the jail, special management was for mentally ill and developmentally delayed inmates, and an inmate like Mr. Lozano with a history of violence could not be intermingling with inmates of that classification. But there was no difference in mental health treatment that Mr. Lozano received in his housing unit where he remained because the same mental health staff treated him in the E-dorm. He would have been in a single-man cell whether he were in special management or his current housing unit. He would have received the same medication from the same mental health provider. So there really, in effect, would not have been a difference in the course of his mental health treatment whether he was on the eighth floor of the jail or in the E-dorm of the jail. He still received mental health care. As evidenced by Mr. Manstock, going out less than 48 hours after he was and Mr. Lozano was taken off suicide watch and Mr. Manstock going to Mr. Lozano's cell to conduct his suicide risk assessment. So the fact that Mr. Choi recommended special management and that he didn't go to a particular physical location in the jail doesn't change the fact that Mr. Lozano still received the same mental health treatment that he would have received at that location. Moreover, Mr. ---- Robertson, let me ask you this. Was Manstock aware of Dr. Choi's assessment? The record's unclear about that. The record's not clear of whether he was. I mean, he mentioned that he reviewed all of the records, but he was not specifically asked in his deposition if he was aware of Mr. Choi's recommendation. But Mr. Manstock didn't make a decision about the exact location of Mr. Lozano's cell. The one thing that Mr. Manstock had the power to do in his clinical judgment, if Mr. Lozano needed to be put on a suicide watch, he could have ordered 15-minute checks, which would have resulted in him being placed in a different cell called an observation cell, which is where inmates on suicide watch are housed. Or Mr. Manstock could have deemed Mr. Lozano suitable for an involuntary hold under California Welfare and Institutions Code Section 5150, which would have meant that Mr. Lozano would have been admitted, as he had been in April, to the jail's acute psychiatric unit, which is also called in the record 8A. But Mr. Manstock did neither of those things, because in his clinical judgment, he determined that Mr. Lozano was not suicidal. So there was no need to have a change in his housing status, and he actually recommended in his note that no change in Mr. Lozano's housing status was necessary. So about the same time, the superior court had made a determination that, what was it, that he needed a Murphy conservatorship? That's correct, Your Honor. So the court placed Mr. Lozano under a temporary conservatorship, a Murphy conservatorship, on May the 12th. And it deemed him incompetent to stand trial in his criminal case. That would have been the criminal case that he was booked under, which was the attempted murder charges. But the court noted that Mr. Lozano faced additional charges for assaulting custody staff. So instead of ordering him released from the jail and placed into a mental health hospital somewhere in the state, the court actually set a further hearing in June for Mr. Lozano to return to court for proceedings pertaining to those additional assault charges that he had. So there was no order to remove him from the jail and place him in a hospital. The court placed him under a temporary conservatorship and issued a or ordered a subsequent court date in June. So as I understand what the superior court, what the district court did was it took a look at all of these facts. It didn't have the benefit of Castro, I don't think. The court did note Castro and said that the court acknowledged there was perhaps some, it was unclear whether Castro applied in these particular circumstances but went ahead and said under either the objective or the objective, subjective or objective standard, it applied. And said as a matter of law, no reasonable, well, it said no reasonable fact finder could conclude that under these circumstances that Manstock was deliberately indifferent to his medical needs and made a legal, and just that's a legal determination the way he did it. Is that right? Right. I mean, and. So why, how could he do that under these circumstances? Why shouldn't that be a question for the jury? Your Honor, so the deliberate indifference standard and even the Castro standard requires something more than mere negligence. And it's true. The experts in this case had disagreements about whether Mr. Manstock's suicide risk assessment met the standard of care. And that could be a medical negligence claim, I will concede that, which we don't have in this case. We have a 14th Amendment claim. And the mere fact that reasonable minds can differ about whether this was or was not an adequate suicide risk assessment, that in and of itself shows that Mr. Manstock did not act with deliberate indifference. He didn't act with reckless disregard toward Mr. Lozano's needs. He had to make a difficult decision that day, as many of his colleagues did, about whether Mr. Lozano was suicidal. And that is exactly what the 14th Amendment does not hold public officials to a negligence standard. It requires more than negligence. But even if this Court were to find that Mr. Manstock violated Mr. Lozano's constitutional rights, he would be entitled to qualified immunity because there is no clearly established law regarding the constitutional standard for suicide precautions. So, in effect, he did the best he could. Did the district court address qualified immunity? I don't think the district court did because it determined that there was no constitutional violation. We had another discussion with counsel about the liability of the county for its alleged policies. Municipal liability. Yes. So of the Monell claim, I wish the Court's order had been more clear. He seemed to have erred, correct? Correct. And so this Court has already pointed out that, and I would point out, this Court has de novo review. And as this Court has already stated, there are other paths to municipal liability, namely failure to train or if there is a policy that was adhered to with deliberate indifference and a causal link between that policy and the constitutional violation. And I would submit to this Court that neither of those paths to Monell liability exist in this case because there's no policy that my opposing counsel has pointed to where there's a causal connection with the ---- Is the failure to train a policy? It could be if the municipality was aware of a need for training and disregarded that obvious need for training. But in this instance, the record is replete with mental health professionals seeing Mr. Lozano repeatedly and making judgment calls based on their professional clinical judgment about whether he's suicidal or not. And there's no evidence that the undersheriff, who also served as the chief of correction, was aware of some need to improve the training of the mental health staff at the jail, which included social workers, nurse practitioners, marriage and family therapists, psychiatrists and psychologists. What about the assertion that classification considerations were given higher priority than assessments, medical assessments? Was that a policy? Well, there's what is incomplete about Mr. Craft's statement with regard to that is that if a mental health professional believes that an inmate is suicidal, they have the ability to put that person on suicide watch, which would automatically take that person into an observation cell where they can be monitored and checked every 15 minutes. Or they have the ability, if the person is acutely psychotic, to admit that person into the jail's acute psychiatric unit under the Welfare and Institutions Code 5150. And classification can't do anything about that, nothing at all. But if a mental health professional says, this inmate is not suicidal, I am not putting them on suicide watch, and I'm not admitting them into the jail's acute psychiatric unit, then classification has to make a decision on how to house that person to protect both the inmate, the other inmates in the facility, and staff at this facility. So classification had to look at the totality of the circumstances and realize that he was taken off suicide watch, he was no longer on suicide watch, and they had to place him in an environment where he couldn't assault other inmates and staff. So is it your position that counsel didn't identify for the district court any policies? He identified what he believed were policies, but I don't think there was any causal relationship between those policies and the constitutional violation. We had mentioned the classification decision-making with regard to protective custody inmates that we just talked about. He also mentioned a failure to train, which there's really no evidence in the record that the county failed to train its mental health staff. And he also mentioned that the county used to have contracts with other counties to provide acute psychiatric services to their inmates. So inmates from other counties could come to Santa Clara County and be admitted into the jail's acute psychiatric unit because those are rare, and our county is one of the few jails that has those. But there's no indication in the record that Mr. Manstock, for example, wanted Mr. Lozano admitted into 8A and didn't have the ability to do so because there were no beds. In fact, just a month before Mr. Lozano's suicide, he was admitted into 8A when a mental health professional wanted him to be there, and a psychiatrist is the person who discharged him from 8A. And I see that my time is up, Your Honor. Unless there are any other questions, the appellees will submit. Okay, thank you. Thank you. Your Honors, in regards to Mr. Manstock, he has a – after he conducted his interview, he prepared what's called a SOAP note, a note which is a progress note, and he said that Mr. Lozano was not gravely disabled. Mr. Lozano had already been found gravely disabled by a psychiatrist and by the court, and that information was in Mr. Lozano's record, his medical record, which Mr. Manstock was required to review before he encountered Mr. Lozano. So one of two things has to be true. He didn't read the record or he didn't appreciate what was in the record. What was his role? What was his status there in the jail? Mr. Manstock was a family therapist, and he was what's called a mental health clinician. He interviewed and assessed inmates. In this case, when he interviewed Mr. Lozano on the 15th of May, there had been discussions by other clinicians that Mr. Lozano should go to 8A because he had been conserved and was on a Murphy conservatorship. There were discussions about why he wasn't in 8A. Nobody could understand that. And Mr. Manstock was the first clinical clinician to find Mr. Manstock in solitary confinement, and he did nothing about it when the evidence suggested that all the other mental health personnel believed he should be on 8A. In regards to ‑‑ Okay, this is your last point. Judge Wallington's point about whether or not a policy a county can be held liable for ‑‑ Microphone, please.  ‑‑for a policy that's not, that amounts to inaction is long versus County of Los Angeles 442 Fed 3rd 1178. Thank you. Thank you, counsel. We appreciate your arguments in this case today. The matter is submitted. That ends our session for today. Thank you.
judges: Paez, Rawlinson, Huck